[No. S004689. Crim. No. 24585. Oct. 25, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES EDWARD WHITT, Defendant and Appellant.

628

**COUNSEL**

Brian O'Neill, under appointment by the Supreme Court, Brian C. Lysaght, Frederick D. Friedman, Carol K. Lysaght and O'Neill & Lysaght for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant Attorney General, Michael D. Wellington, Louis R. Hanoian and Lilia E. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EAGLESON, J.—A jury convicted defendant Charles Edward Whitt of one count of first degree murder (Pen. Code, § 187),[1] one count of robbery (§ 211), and one count of assault with a deadly weapon (§ 245, subd. (a)). Before trial, defendant pled guilty to one count of possession of a firearm by an ex-felon (§ 12021). The jury found true a special circumstance that the murder was committed in the course of a robbery (§ 190.2, subd. (a)(17)(i)). After a penalty trial, the jury sentenced defendant to death under the 1978 law.

On automatic appeal, this court affirmed the guilt judgment, but set aside the special circumstance finding and reversed the death judgment. (*People v. Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161] (*Whitt I*).) The sole basis for reversal was the trial court's failure to instruct on intent to kill as an element of the felony-murder special circumstance under *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. After special circumstance and penalty retrials, the jury once again imposed the death penalty. The trial court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)), and entered a judgment of death. This appeal is automatic. (§ 1239, subd. (b).)

The appellate record discloses no prejudicial error. The judgment will be affirmed in its entirety.

### I. FACTS

#### A. *Special Circumstance Retrial*

As in the original guilt trial (see *Whitt I, supra,* 36 Cal.3d at pp. 729-732), prosecution evidence established that defendant committed the charged crimes on July 6, 1980, in two neighboring mountain communities in San Bernardino County.

At 8 o'clock that evening, defendant arrived in his truck at the Yucaipa home of acquaintance Clella Ann Goforth. Defendant asked to see Goforth's business partner, Harold Williams, but Williams was not there. Defendant told Goforth that he wanted to sell some livestock and tools because he and his wife were separating and he needed the money.

During their 10- to 15-minute conversation, defendant and Goforth stood about 1 foot apart. They were separated by a five- to six-foot high cement

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

wall, but could see each other through large holes in the decorative blocks that lined the top two feet.[2] Defendant said he was "angry" about the marital breakup, but Goforth thought he acted "coolly." His speech was "coherent," and he did not appear to be under the influence of drugs or alcohol.

Defendant walked back to the driver's side of the truck, which stood facing Goforth about four feet from where defendant had been standing. He got in and, through the open window, calmly said, "I'll be back to see Harold." Goforth watched him through the hole in one cement block, and rested her hand in another. Suddenly, defendant fired a shotgun at her. The force of the blast knocked her to the ground, but no pellets hit her. The blast left a "crater" and some pellets in the wall directly in front of where she had been standing.

Goforth stood up and saw defendant drive to the intersection of Juniper and Bryant Streets. Defendant momentarily stopped the truck, evidently reloaded the gun, and then sped away.[3] Goforth called the sheriff.

About 20 minutes later, defendant arrived at the Elkhorn General Store in Forest Falls. He bought a can of Michelob beer and a pack of Camel cigarettes from the clerk, Linda Weisz. Two other customers were in the store at the time. Weisz sensed that defendant was "nervous" but in "control." He displayed no signs of intoxication. Defendant left the store after making his purchases, and the other two customers soon followed suit.

Defendant reentered the store a few minutes later. He pointed a shotgun at Weisz, led her by the arm to the cash register, demanded that she give him the "big bills," and said she would not get hurt if she complied. She gave him about $250. He then backed out of the store at an angle, watching and pointing the gun at her the entire time. Five to ten seconds after defendant had passed through the doorway, Weisz heard a gunshot. She then heard the sound of tires on the gravel parking lot. Weisz locked the door and called her boss.

The victim of the shooting, William McCafferty, was discovered on the ground in front of the store by local residents who heard the gunshot

---

[2] Goforth testified it was the "middle of summer" and there was ample "daylight."

[3] Goforth did not actually see defendant reload the gun. However, the weapon is a single-shot, 20-gauge, sawed-off shotgun which must be loaded before each firing. An expended cartridge is ejected during reloading. An expended 20-gauge shell of the same make as the ammunition used by defendant was found by investigators at the intersection of Juniper and Bryant near Goforth's house. Defendant used the same shotgun to commit a robbery-murder at the Elkhorn General Store in Forest Falls about 30 minutes after the Goforth assault. An expended shotgun shell was found within 100 yards of the Elkhorn store.

and/or saw a truck like defendant's speeding away from the store between 8:30 and 8:48 p.m.[4] McCafferty died within minutes as a result of a shotgun wound to the right side of the neck. Fingers on his left hand had also been injured by the blast. The sheriff was called, and descriptions of defendant and the truck were broadcast over police radio.

Shortly after 9 p.m., a patrol car stopped defendant in his truck a few miles from Forest Falls. He was arrested and taken to the sheriff's station, where approximately $250 in cash was found on his person. A blood test administered at 11:09 p.m. showed a .10 percent blood-alcohol level. Expert testimony established that depending upon various factors—such as the rate of alcohol absorption and burnoff, body weight, and drinking pattern—defendant's blood-alcohol level near the time of the initial stop could have been lower than .10 percent or higher than .14 percent.

Pursuant to a warrant, officers searched defendant's truck and found a loaded 20-gauge, sawed-off shotgun on the floor of the passenger compartment and several live rounds of 20-gauge ammunition in the glove compartment. A pack of Camel cigarettes and an empty Budweiser beer bottle were also seized from the truck.

An expert criminalist tested defendant's shotgun and ammunition, and opined that the trigger responds to "average" force; it is neither "hard" to pull nor a "hair trigger." The witness also testified that based on "shot pattern" comparisons, McCafferty was standing six to nine feet from the end of the barrel at the time the gun was fired. The pathologist who performed the autopsy on McCafferty confirmed that the neck wound was inflicted at "close range," but that the gun was "not held directly against the body" at the time.

The day after the crimes, defendant was placed in a county jail cell with Jimmy DeLoach, who was awaiting sentencing following extradition from Georgia on an escape charge. They shared the cell for approximately three weeks, and purportedly spoke many times about defendant's crimes.

DeLoach testified that defendant made the following statements about the Goforth assault: defendant drove his truck to a man's house to collect on a debt, but was told by a woman that the man was not there. Defendant replied, "Well, okay, tell him this." Defendant grabbed a shotgun from inside the truck and shot at the woman. Defendant "blew the wall away," and did not know "how in the world [he had] missed her."

[4] Shortly before the murder, the victim had a friendly chat near the store with Dr. Bowman. (Both men lived in Forest Falls and taught at a nearby university.) According to Dr. Bowman, it was "late dusk," but there was still some daylight outside.

DeLoach testified that defendant described the Elkhorn store robbery as follows: defendant held the shotgun to the clerk's face and said, "Pop the cash register. Give me nothing but big bills." Defendant took the money, backed out of the store, and heard a man behind him ask, "What [are] you doing?" Defendant turned around, and "blew him away." Defendant did so in order to eliminate a "possible witness" to the robbery. Defendant started to reenter the store to kill the clerk for the same reason, but knew that the shotgun blast had probably attracted attention and that he should leave the area "real quick." After driving in a direction away from Yucaipa for 25 to 30 minutes, defendant turned around and came back because he wanted to kill the woman he had shot at earlier (Goforth). He was stopped by a sheriff's "roadblock" en route to her house. Defendant thought about "shoot[ing] it out with them," but knew he was "outnumbered."

According to DeLoach, defendant said he was planning to present a defense that he had been drinking beer all day even though he had actually consumed only a couple of cans of beer before the crimes and was not drunk. In the alternative, defendant purportedly was considering a claim of "self-defense," i.e., that McCafferty "grabbed the barrel of the shotgun" and it "accidentally went off."

The defense presented no evidence at this phase of the proceedings.

B. *Penalty Retrial*

The prosecution introduced a certified copy of defendant's 1974 robbery conviction. At the prosecutor's request, the court instructed the jury that defendant had pled guilty in the instant case to one count of possession of a firearm by an ex-felon.

Defendant, who was 30 years old at the time of the crimes, introduced evidence describing his life from childhood through residence on "Death Row" at San Quentin Prison.

Defendant's father, Edgar, a retired battalion chief for the Los Angeles County Fire Department, testified that defendant was born with a congenital heart problem which required three hospitalizations and regular medical attention during childhood. Defendant has an older brother and younger sister. As youngsters, all three children were "close" to their mother, who did not work outside the home. Edgar described the family as having a "normal middle class" life, which included regular outdoor camping and recreation trips.

Edgar recalled that defendant graduated from high school with good grades. Defendant tried to enlist in the armed services, but was rejected for

medical reasons. Afterwards, Edgar noticed that defendant became "despondent," and that his life-style changed. He moved out of his parents' home at about age 20, but returned occasionally to recuperate from drug and alcohol abuse. Edgar testified that once, after a "bad trip" on LSD, defendant acted strangely by bathing compulsively, shaving his head, and claiming to see spiders on the wall. His parents sent him to a therapist for several weeks. On another occasion, defendant was found by police standing on a brick in the middle of the street "trying to keep his head above water." His parents admitted him to a state mental hospital for "drug-related" treatment. He was released a few days later, and given antipsychotic medication for several months.

Edgar testified that defendant was arrested several times on various drug and theft charges. Defendant's relationship with his mother became "strained" because she could not tolerate his drug and alcohol use.[5] According to Edgar, defendant never acted violently towards his parents.

Defendant's wife Sherry testified that in 1980 she and defendant rented a house near Yucaipa from defendant's parents. They lived there with Sherry's daughter from a prior relationship. Sherry and defendant's father both testified that defendant displayed affection for the daughter, treating her as though she were his own child.

Sherry testified that defendant's mood began to change in January 1980, after he lost his job installing mobilehomes. He became "depressed," stopped looking for work, and started drinking beer and peppermint schnapps and smoking marijuana. Sherry explained that in the six-month period before the crimes, defendant "often" consumed these substances "at the same time" and became "drunk." During such episodes, defendant passed out, or yelled at the television set and accused her and the neighbors of conspiring against him. Defendant also complained to Sherry of having a "haunted ear"—"people living inside of his ear." Sherry insisted that defendant never became physically abusive towards her or her daughter.

Sherry recalled that one week before the crimes, she told defendant—as she had several times before—that she would leave him if he did not stop drinking. Three days later, the parents visited defendant and Sherry to discuss delinquent rental payments on the house. Edgar testified that defendant sat watching and talking to the television set most of the time they were there. Suddenly, defendant sprang to his feet, angrily accused his parents of disrupting his life, and ordered them to leave. Defendant's

---

[5] Defendant's mother died before the retrial. Edgar mentioned that "early in her life" she had received treatment "for a mental problem," but he did not elaborate.

mother then handed Sherry an eviction notice and the parents left. Edgar testified he had never seen defendant act this way before.

The day before the robbery-murder, Sherry and defendant argued over his drinking. Sherry gave conflicting testimony as to whether defendant in fact consumed any alcohol that day. However, she was certain that defendant was "sober" when they awoke the next morning—the day of the crimes. Defendant left the house for two hours that morning, and returned at noon with a can of beer in his hand. Sherry said he was "drunk" and "staggering." He left a second time and returned about 2:30 p.m. in the same physical condition.

Longtime acquaintances, Charles and Natalie Friend, testified that defendant visited them the same afternoon. The two men consumed a total of twelve to twenty-four cans of beer over a two-hour period. Both Charles and Natalie believed that defendant was under the influence of alcohol by the time he left the house about 5 p.m. Charles testified that defendant was friendly and "talkative"—a mood he typically displayed when drinking beer. Natalie thought defendant may have been a "little" upset over the recent confrontation with his parents. In general, she described him as a nonthreatening person.

Near the time of the special circumstance retrial, Dr. Demos, a psychologist, spent a total of 10 hours interviewing defendant and administering various psychological tests. Dr. Demos testified that defendant suffers from a "paranoid schizophrenic" condition and from alcohol and opiate addictions that are all "in remission." Defendant also was diagnosed as having a "histrionic personality disorder" which causes him to "exaggerate" his accomplishments, such as bragging about the crimes to DeLoach. Dr. Demos determined that defendant also has a chronic "anti-social personality disorder" typified by a "selfish" disrespect for the law. Dr. Demos testified that he believed defendant's claim that the shooting was "an accident" and that defendant is now "sorry" about what he had done.

Two convicted capital murderers, Ronald Sanders and William Payton, described changes in defendant's behavior on "Death Row." Both testified that when they first met defendant, he refused to interact with other inmates except to occasionally drink and gamble. They also said he engaged in strange behavior, such as collecting insects, refusing to bathe, watching a blank television set, and speaking to inanimate objects. Sanders testified that around January 1984, defendant was moved to an "isolation cell." When he returned to his regular cell a few days later, he was invited by Sanders to join an inmate group that studies the Bible and Christianity, and conducts

group prayer.[6] Defendant agreed to join and, according to both Sanders and Payton, is now a "born-again Christian." Defendant purportedly attends daily group meetings, reads the Bible, and discusses religion with enthusiasm. In Payton's words, defendant shows "compassion" towards fellow inmates by "shar[ing]" his few material possessions and "counsel[ing]" others to avoid crime.

## II. Special Circumstance Issues

In *Whitt I, supra,* 36 Cal.3d 724, we affirmed defendant's convictions of all felony charges (murder, robbery, assault, and weapon possession). As noted, the special circumstance finding was vacated and the penalty judgment reversed, because the jury had not been instructed that intent to kill was an element of the robbery-murder special circumstance. (See *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, 153-154 *(Carlos).) Carlos* applied on appeal in *Whitt I,* even though defendant's crimes were committed and tried before *Carlos* was decided. (See *People* v. *Garcia* (1984) 36 Cal.3d 539, 549 [205 Cal.Rptr. 265, 684 P.2d 826] [holding *Carlos* applies "retroactively to all cases not yet final"].)

Defendant observes that, upon retrial of the special circumstance in February 1985, "the sole disputed issue" was whether he intended to kill the victim when he fired the fatal shot. Defendant concedes that a *Carlos* instruction was duly given upon retrial, and that the jury explicitly determined that he acted with intent to kill when it found the special circumstance to be true.

■ Defendant insists, however, that the special circumstance finding should be vacated a second time because: (1) the court erroneously denied his motions to suppress and strike testimony by informant DeLoach indicating that defendant admitted an intent to kill; (2) trial counsel was ineffective in failing to present any evidence that the killing was accidental, and in failing to object to evidence of the Goforth assault;[7] (3) prosecutorial

---

[6] Sanders explained that the prayer group calls itself the "Christian Brothers" and is affiliated with "Dove Flight Ministries." The latter group apparently has members on death rows in several states and countries, and publishes the Dove Cage magazine. Payton testified that he is an editor of the magazine, and that the magazine is circulated every 6 weeks to 3,500 inmates and other interested parties.

[7] Defendant insists he was prejudiced by counsel's failure to object to the Goforth assault on relevance grounds. Insofar as this claim is directed to the intent-to-kill element of the instant special-circumstance finding, we will show that it fails in light of recent controlling changes in the law.

In any event, an objection would almost certainly have been futile. Evidence of the Goforth assault bears on the prosecution's theory that defendant was angry and intended to kill

argument misled the jury into believing that the intent-to-kill issue had already been decided against defendant at the original guilt trial; and (4) the court erroneously instructed the jury that, in determining the intent-to-kill question, it was to assume defendant was of sound mind at the time of the crimes.

The Attorney General argues that because these claims relate only to the intent-to-kill element, any error is harmless under *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] (*Anderson*). We agree. *Anderson* overruled *Carlos*'s holding that the 1978 death penalty law imposes a blanket intent-to-kill requirement on all felony-murder special circumstances. *Anderson* held that intent to kill need be charged and proved for a felony-murder special circumstance only where the defendant was an *aider and abettor* to the homicide and *not the actual killer*. (43 Cal.3d at pp. 1138-1147.) Here, defendant does not dispute, and the evidence confirms, that he personally killed McCafferty in the commission of a robbery upon Weisz. All four challenges to the special circumstance finding on retrial are immaterial under *Anderson*.

■ For similar reasons, we reject defendant's claim that a valid intent-to-kill determination was necessary to satisfy the Eighth Amendment. Assuming proper consideration of individual circumstances, a death sentence may constitutionally be exacted against one who "*actually* killed, attempted to kill, *or* intended to kill . . . ." (*Tison* v. *Arizona* (1987) 481 U.S. 137, 150 [95 L.Ed.2d 127, 139, 107 S.Ct. 1676] (italics added), construing *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368]; in accord, *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689].) Defendant's attempt to distinguish the *Tison-Enmund-Cabana* line of cases on grounds it concerns only "non-killer" felony murderers is unpersuasive. The high court has made clear that imposition of the death penalty upon "actual killers," like defendant, is not unconstitutional per se.

■ Defendant responds that to apply *Anderson*, *supra*, 43 Cal.3d 1104, retroactively to his crimes violates federal due process because he lacked "fair warning" that intent to kill was not a prerequisite to death eligibility. (See *Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 352 [12 L.Ed.2d 894, 899, 84 S.Ct. 1697] [barring "unforeseeable" retroactive expansion of criminal liability].) We rejected the same claim in *People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082], on grounds that

---

anyone he encountered on the night of July 6, 1980. (Evid. Code, § 1101, subd. (b).) As noted by the prosecutor in closing argument at the special circumstance retrial, "Anyone who disturbed [defendant], anyone who got in his way, anyone who irritated him was going to be . . . shot dead." For similar reasons, defense counsel cannot be faulted for failing to object to DeLoach's testimony that defendant admitted intending to kill Goforth, Weisz, and McCafferty.

the statute itself "ambiguous" and provides ample "pre-*Carlos* foreseeability of a holding that such intent is not required for the actual killer. [Citation.]" (Compare *In re Baert* (1988) 205 Cal.App.3d 514, 517-522 [252 Cal.Rptr. 418], review den. Jan. 19, 1989, cert. den. *sub nom. California* v. *Baert* (1989) 492 U.S. 918 [106 L.Ed.2d 589, 109 S.Ct. 3242] [refusing to apply *Anderson* to crimes committed in the four-year "window" period between *Carlos* and *Anderson*].)

Defendant asks us to reconsider *Poggi, supra,* 45 Cal.3d at pages 326-327, but we see no reason to do so. *Anderson* has since been applied to appellants convicted of pre-*Carlos* felony murder, even where a *Carlos* instruction was given at their trials. (See, e.g., *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1182-1183 [270 Cal.Rptr. 286, 791 P.2d 965]; *People* v. *McDowell* (1988) 46 Cal.3d 551, 566 [250 Cal.Rptr. 530, 758 P.2d 1060]; see also *People* v. *Burton* (1989) 48 Cal.3d 843, 858-859 [258 Cal.Rptr. 184, 771 P.2d 1270]; *People* v. *Malone* (1988) 47 Cal.3d 1, 25 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Keenan* (1988) 46 Cal.3d 478, 503-504 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Melton* (1988) 44 Cal.3d 713, 747 [244 Cal.Rptr. 867, 750 P.2d 741].) Because intent to kill was not clearly an element of the felony-murder special circumstance for actual killers at the time of defendant's crimes, *Anderson* applies.

■ Defendant argues, however, that our prior decision applying *Carlos*'s intent-to-kill requirement to his crimes is "law of the case." (See *Whitt I, supra,* 36 Cal.3d 724, 734-736.) He relies on the general notion that where an appellate court states a rule of law necessary to its decision, such rule " 'must be adhered to'." in any " 'subsequent appeal' " in the same case, even where the former decision appears to be " 'erroneous.' " (*People* v. *Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211], citation omitted.)

"The primary purpose served by the law-of-the-case rule is one of judicial economy." (*Searle* v. *Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 435 [212 Cal.Rptr. 466, 696 P.2d 1308].) It prevents the parties from seeking appellate reconsideration of an already decided issue in the same case absent some significant change in circumstances. (See, e.g., *People* v. *Shuey, supra,* 13 Cal.3d at pp. 840-841.) In criminal cases, the prosecution and defense are both bound by the rule. (*Id.,* at p. 845.) Capital defendants are no exception. (See, e.g., *People* v. *Keenan, supra,* 46 Cal.3d 478, 505-507; *People* v. *Ghent* (1987) 43 Cal.3d 739, 758-759 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Contrary to defendant's suggestion, the doctrine is not intended to protect parties from unfavorable changes in the law. Indeed, one well-settled

exception exists where there has been a "controlling" change in the law between the time of the first and second appellate decisions. (*George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1291 [265 Cal.Rptr. 162, 783 P.2d 749]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 146 [207 Cal.Rptr. 800, 689 P.2d 430]; *People* v. *Shuey, supra*, 13 Cal.3d at pp. 845-846; *DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 179-180 [18 Cal.Rptr. 369, 367 P.2d 865]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 756, pp. 724-725.)

Just as the law-of-the-case rule applies equally to both sides in a criminal case, so do its exceptions. (See, e.g., *People* v. *Ramos, supra*, 37 Cal.3d at p. 146.) Obviously, *Anderson* is an intervening, controlling change in the law. It corrected prior mistaken assumptions about the 1978 state statute and federal case law, and concluded that intent to kill is not an element of the felony-murder special circumstance for actual killers. (See *Anderson, supra*, 43 Cal.3d 1104, 1143.)

Defendant insists it is "unjust" and "arbitrary" to preclude a capital defendant from asserting the law-of-the-case doctrine in his favor. However, the cases belie any such claim. (See *People* v. *Keenan, supra*, 46 Cal.3d at pp. 505-507; *People* v. *Ghent, supra*, 43 Cal.3d at pp. 758-759.) Here, application of *Anderson, supra*, 43 Cal.3d 1104, simply precludes a possible *third* trial of the felony-murder special circumstance for redetermination of an issue which the law now deems to be immaterial. Defendant is in the same position as all appellants who personally committed felony murder before *Carlos, supra*, 35 Cal.3d 131, including those whose trials were conducted while *Carlos* was the applicable law. (See *People* v. *Ramirez, supra*, 50 Cal.3d at pp. 1182-1183.) The only difference in defendant's case is the fortuitous timing of his first appeal. We see no injustice in applying *Anderson* to defendant's pre-*Carlos* robbery-murder.

### III. Penalty Phase Issues

#### A. *Pretrial Instruction on Case History*

■ Defendant challenges an instruction read to prospective jurors before voir dire, and repeated immediately before the start of the special circumstance retrial. The instruction described the prior jury's verdict (including the death sentence), this court's subsequent disposition on automatic appeal, and the jury's duties on retrial.[8]

---

[8] The instruction provided in pertinent part: "In April 1981, the defendant . . . was found guilty of murder[,] . . . robbery[,] . . . and assault . . . . [T]hese [crimes] are felonies. [¶] [A] penalty trial was held to determine if the defendant should receive life imprisonment without the possibility of parole or the penalty of death. And in April 1981 the jury

Defendant contends the instruction violated Eighth Amendment constraints against leading the sentencer "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 239, 105 S.Ct. 2633].) Defendant insists the instruction encouraged jurors to focus upon "irrelevant" and "speculative" information, and to overlook mitigating evidence introduced about his particular crimes and background. (See *People* v. *Ramos, supra,* 37 Cal.3d 136, 155-158; see also *People* v. *Thompson* (1990) 50 Cal.3d 134, 178 [266 Cal.Rptr. 309, 785 P.2d 857].) The prosecutor purportedly exploited the prior verdict in closing argument.[9]

However, any "error" in giving the instruction was invited by defendant's "own conduct." (*People* v. *Lang* (1989) 49 Cal.3d 991, 1031-1032 [264 Cal.Rptr. 386, 782 P.2d 627], citing *People* v. *Perez* (1979) 23 Cal.3d 545, 549-550, fn. 3 [153 Cal.Rptr. 40, 591 P.2d 63].) At the court's request, the prosecutor and defense counsel each submitted an informal written statement from which the court and counsel fashioned the instruction.[10] Defendant, through his own statement, urged the court to instruct the jury with virtually all of the information now challenged on appeal, i.e., that the prior jury imposed death, that this court reversed the special circumstance and penalty determinations for instructional error, and that the second jury was required to "redetermine[]" these two issues. Although it is not clear whether defendant's statement mentioned the "automatic" nature of the appeal, he did not object to ultimate inclusion of this fact in the court's instruction. Defendant's objections were limited to any reference to the prior jury's finding that the special circumstance allegation was true.

determined that the appropriate penalty . . . was death. [¶] . . . [D]efendant's case was automatically appealed to the California Supreme Court [which,] in August 1984[,] . . . affirmed the previous jury's verdict as to guilt . . . . [¶] You are not . . . in this retrial . . . to reconsider the defendant's . . . guilt or innocence as to th[e] three felonies . . . . [¶] *The Supreme Court, however, did not uphold the death penalty because the jury was not instructed to find whether the defendant . . . intended to kill the victim . . . . Because of this error[,] the special* [*circumstance*] *portion must be redetermined.*" (Italics added.) The record discloses that, at a minimum, defendant contributed to the italicized portion of the court's instruction.

[9] We disagree. The prosecutor never explicitly mentioned the prior death sentence or prior appeal. He told jurors they were to act as "judges" and determine the "appropriate" penalty. He described this task as one of assessing both the "social impact" of defendant's crimes and the "reason" for the death penalty law. The prosecutor opined that a death sentence would "uniformly" be imposed upon defendant regardless of when or where his case was tried. In context, however, this comment obviously meant that the evidence so overwhelmingly warranted death that no reasonable jury could disagree.

[10] As acknowledged by both parties in their briefs, the "statements" are not part of the record on appeal. Nevertheless, transcribed discussions between the court and counsel identify which "statement" provided some of the language eventually included in the court's instruction. At a minimum, defendant's "statement" contained the critical language identified earlier. (See fn. 8, *ante.*)

Counsel's tactical reason for disclosing the prior death sentence is clear. Realizing that little mitigating weight might be placed on defendant's "normal middle class" background, counsel plausibly chose to present a defense of "Death Row" redemption. (See, e.g., *People* v. *Robertson* (1989) 48 Cal.3d 18, 33-34 [255 Cal.Rptr. 631, 767 P.2d 1109]; *People* v. *Wilson* (1969) 1 Cal.3d 431, 436-437 [82 Cal.Rptr. 494, 462 P.2d 22].) This strategy is apparent in counsel's direct examination of inmates Sanders and Payton, and his attempt to introduce an edition of the Dove Cage magazine containing a "Death Row" interview with defendant. Counsel also emphasized in closing argument that defendant is "not the same man" a jury had sentenced to death four years earlier.

There may have been no independent tactical reason for disclosing defendant's right of "automatic appeal." However, under the circumstances, that disclosure added little to what the jurors already knew. Any reasonable jury, apprised that defendant had already once been sentenced to death and was now being resentenced for the same crimes, could easily infer that an appeal from a death verdict was available and would inevitably be taken. Accordingly, counsel's plausible tactical decision below prevents defendant from contending that any resulting "error" warrants reversal on appeal. (*People* v. *Avalos* (1984) 37 Cal.3d 216, 228-229 [207 Cal.Rptr. 549, 689 P.2d 121]; cf. *People* v. *Wickersham* (1982) 32 Cal.3d 307, 334-335 [185 Cal.Rptr. 436, 650 P.2d 311].)

B. *Exclusion of Defendant's Interview with Dove Cage Magazine*

■ Outside the jury's presence, defendant sought to introduce the testimony of inmate Payton for purposes of showing defendant has "change[d]" on "Death Row" and now feels "remorse." To the same end, counsel proffered an article from the Dove Cage magazine, purporting to quote a prison interview conducted by Payton with defendant in March 1984. Defendant discussed three topics in the interview: (1) past exploits, (2) past feelings, and (3) his new attitude toward life.[11]

---

[11] The interview is printed in an edition of the Dove Cage magazine marked as exhibit "MM" and made part of the record on appeal.

Most of the interview consists of defendant describing past events, such as "getting loaded" and associating with "juvenile delinquents" at age 12; "partying" with motorcycle gangs at age 17; being arrested 23 times and "strung out on drugs" at age 20; and becoming "a gang-related inmate" while previously imprisoned for robbery.

The interview gives virtually no insight into defendant's emotional life until he describes life in Yucaipa with Sherry. He says their relationship was "great" until he stopped "smoking pot" at her request, experienced a "mental breakdown," and committed the robbery-murder. Defendant said he initially feared death and behaved strangely after arriving on "Death Row" in May 1981.

At the very end of the interview, defendant describes his current attitude toward life: "My life is alive now. I have a sparkle in my heart. Maybe I'm on death row but I'm not dying.

The prosecutor vigorously objected to the entire offer of proof. He argued, among other things, that defendant's postcrime personality changes were irrelevant to the penalty determination, and could have been "fabricated" with the hope of securing leniency at some later date.

The court ruled that Payton's testimony was admissible insofar as it described his personal observations of defendant's behavior in prison. It found such observations relevant and mitigating, because they bore on defendant's theory that he possessed redeeming character traits and had adjusted well in prison. However, the court refused to admit: (1) any testimony by Payton recounting defendant's statements during the prison interview, and (2) the Dove Cage article quoting the same statements. The court excluded both items under Evidence Code section 352 and the hearsay rule. In the court's view, defendant was attempting to introduce his out-of-court statements as a means of "testifying" free of cross-examination.

We first reject defendant's claim that the court erred in excluding evidence of the prison interview under Evidence Code section 352. Many of the events discussed in the interview were cumulative of trial testimony by defendant's wife, father, and co-inmates. And, many of the interview topics not introduced at trial could reasonably be viewed as prejudicial to the defense. Thus, the court did not clearly abuse its discretion in concluding that any attempt to introduce the interview through either Payton or the Dove Cage would risk confusing the jury or consuming undue amounts of time.

 Such evidence could also properly be excluded under the hearsay rule. In both testimonial and documentary form, defendant sought to introduce his out-of-court statements for the "hearsay" purpose of proving that the events and feelings described therein actually occurred, i.e., that he had once acted and felt a certain way but now feels differently. (Evid. Code, § 1200.) Contrary to defendant's assertion, the mental state exception to the hearsay rule does not apply. (*Id.*, § 1250, subd. (a).)[12] The exception is limited to out-of-court statements describing a relevant mental state being

---

The Lord teaches me more about life each day. His Word is the 'Bread of Life.' I am complete, living in Him. Living in peace joined with my Creator, the Father of all mankind. I have love for others now too. I'm in the adopted family of God . . . . [¶] After you have looked at yourself completely and have seen that you're on the bottom of the heap, and that no matter what happens you'll always be, then turn to the Lord, for He is your Savior."

[12] Evidence Code section 1250, subdivision (a) provides: "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind [or] emotion, . . . including a statement of . . . mental feeling, . . . is not made inadmissible by the hearsay rule when: [¶] . . . offered to prove the declarant's state of mind [or] emotion . . . at that time . . . ."

experienced by the declarant *at the time* the statements were made. (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 14.1, pp. 383-384.) Defendant's statements on two topics—events and feelings experienced *before* the interview—do not fit this description, and are inadmissible to prove their truth.[13] The only portion of the interview that seemingly satisfies Evidence Code section 1250, subdivision (a) is defendant's expression of his then existing feelings of Christian rebirth.

However, the trial court could properly conclude that these hearsay statements were "inadmissible" because they were "made under circumstances" indicating a "lack of trustworthiness." (Evid. Code, § 1252.)[14] Defendant participated in the prison interview while his first appeal was pending. It was then possible for the case to be reversed and retried (as ultimately happened), or for the Governor to exercise his commutation power. Public professions of personal redemption could only benefit defendant in the event either of these contingencies occurred. Thus, as the prosecutor urged, there was ample ground to suspect defendant's motives and sincerity during the interview. (See, e.g., *People* v. *Cruz* (1968) 264 Cal.App.2d 350, 357 [70 Cal.Rptr. 603].) ██ Denial of defendant's motion to introduce the interview through either Payton's testimony or the Dove Cage article was not error under state law.[15]

---

[13] Special statutory rules further restrict admission of defendant's hearsay statements on both of these topics.

First, statements recounting past events are an implicit expression of the declarant's belief or memory that such events occurred, and are inadmissible for their truth under Evidence Code section 1250, subdivision (b) ("evidence of a statement of memory or belief to prove the fact remembered or believed" is not admissible under the "mental state" exception). (See also 1 Jefferson, *supra*, § 14.1, at pp. 385-386.)

Second, statements of the declarant's past mental state are not made inadmissible by the hearsay rule if, among other things, the declarant is "unavailable" as a witness, and the statements were not made under circumstances indicating a "lack of trustworthiness." (Evid. Code, §§ 1251-1252.) Defendant was not "unavailable," because he was present in court and had not asserted any privilege against testifying. (*Id.*, § 240.) Indeed, defendant took the stand towards the end of the penalty phase. Also, as will be noted, the court could reasonably conclude that the "trustworthiness" of the entire prison interview was in doubt.

[14] The "mental state" exception in Evidence Code section 1250, subdivision (a) is explicitly made subject to Evidence Code section 1252, which provides: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

[15] We note that the Dove Cage article is *itself* an out-of-court "statement," albeit a "written" one. (Evid. Code, §§ 225, 1200.) To the extent it was offered for its truth, it is subject to the hearsay rule on two separate levels: (1) defendant's oral statements to Payton during the interview, and (2) the magazine's printing of those statements. In order for such "multiple" hearsay to be admitted into evidence, each level must qualify for its own hearsay exception. (Evid. Code, § 1201; 1 Jefferson, *supra*, § 2.1, at pp. 91-92.) As discussed above, defendant's oral statements qualify for no exception. And nothing in defendant's offer of proof suggests that any hearsay exception applies to the interview as printed in the Dove Cage magazine.

Defendant nonetheless contends exclusion of such evidence violated his right to a fair trial and a reliable penalty determination under the federal Constitution. He cites *Green v. Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150] (*per curiam*), finding a due process violation where a capital defendant was barred at the penalty phase from introducing hearsay evidence of an accomplice's spontaneous "confession" exculpating the defendant of murder. The high court observed that even though Georgia recognized no hearsay exception for declarations against penal interest, the evidence was "highly relevant" and there were "substantial reasons" for trusting its "reliability." (*Id.*, at p. 97 [60 L.Ed.2d at p. 741].) Such reasons included the presence of "ample" corroboration and the obvious absence of "ulterior motive." (*Ibid.* [60 L.Ed.2d at p. 741]; see also *People v. Harris* (1984) 36 Cal.3d 36, 70-71 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn. by Broussard, J.).)

■ For the reasons stated above, defendant's personal "Death Row" assurances of reform are not inherently reliable. Admission of such statements in the form and for the purpose offered here would effectively permit defendant to address the jury without subjecting himself to cross-examination. We have previously rejected analogous claims to a "right of allocution" in capital penalty trials, observing that the defendant is entitled to no unique immunity from examination by the People. (*People v. Keenan, supra,* 46 Cal.3d 478, 511; *People v. Robbins* (1988) 45 Cal.3d 867, 888-890 [255 Cal.Rptr. 631, 767 P.2d 1109].) The court did not err in excluding evidence of the prison interview.

### C. *Exclusion of Evidence on Administration of the Death Penalty*

■ Outside the jury's presence, defendant proffered the testimony of artist-journalist Howard Brodie, describing a 1967 execution he witnessed at San Quentin Prison. Defendant also asked that the jury be allowed to view the gas chamber. After hearing Brodie's account on voir dire and listening to counsel's argument, the court excluded the testimony and refused the jury view. It concluded such evidence would only inflame the jury's passions, and was not relevant to determining the appropriate penalty for defendant's crimes.

Defendant contends he was denied his right to present pertinent "mitigating" evidence under the federal Constitution and the death penalty statute. (Citing *Woodson v. North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (plur. opn. by Stewart, J.); § 190.3.) However, we have previously rejected similar claims.

Evidence on how the death penalty is carried out is irrelevant and inadmissible as a matter of law. "Unlike mitigating evidence of a defendant's

background and character, which may be introduced to elicit the sympathy or pity of the jury, accounts of the executions of others do not aid the jury in making an *individualized* assessment of the crucial issue whether the death penalty is appropriate for the particular defendant on trial." (*People v. Grant* (1988) 45 Cal.3d 829, 860 [248 Cal.Rptr. 444, 755 P.2d 894], italics in original; see also *People v. Thompson* (1988) 45 Cal.3d 86, 138-139 [246 Cal.Rptr. 245, 753 P.2d 37]; *People v. Williams* (1988) 44 Cal.3d 1127, 1154 [245 Cal.Rptr. 635, 751 P.2d 901]; *People v. Harris* (1981) 28 Cal.3d 935, 962 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn. by Clark, J.).) There was no error.

### D. *DeLoach's Testimony*

As noted earlier, DeLoach testified at both the original guilt trial and the special circumstance retrial that defendant admitted intentionally killing McCafferty to silence him as a potential witness to the robbery. Defendant argues here, as he unsuccessfully did in his first appeal, that DeLoach's testimony should have been excluded because DeLoach was a government agent through whom the police deliberately elicited incriminating admissions in violation of defendant's Sixth Amendment right to counsel. (*Whitt I, supra*, 36 Cal.3d 724, 736-744; see *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]; *United States v. Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183].) We have already concluded this claim fails insofar as it relates to the intent-to-kill element of the instant special-circumstance finding. (See *Anderson, supra*, 43 Cal.3d 1104.)

Defendant implies that admission of DeLoach's testimony also tainted the penalty retrial. We disagree. We conclude the trial court properly rejected defendant's *Massiah/Henry* claim.

Defendant renewed his motion to suppress DeLoach's testimony on *Massiah/Henry* grounds shortly before the special circumstance retrial began. Defendant conceded he was relying exclusively upon the facts adduced at the first *Massiah/Henry* suppression hearing. As a result, the trial court properly denied the motion on grounds that this court's decision rejecting the claim in *Whitt I* was "law of the case." (See *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56-57 [192 Cal.Rptr. 857, 665 P.2d 947].)

In answer to a single question on cross-examination at the special circumstance retrial, DeLoach indicated that detectives knew he had previously worked as a paid police informant *before* he actually solicited or told them about defendant's alleged jailhouse admissions. This testimony contradicted a key factual assumption underlying our prior holding that the state,

through DeLoach, had not violated defendant's constitutional rights by "creat[ing] a situation likely to provide it with incriminating statements." (*Whitt I, supra,* 36 Cal.3d at pp. 742, 744.) On this basis, defense counsel moved to strike DeLoach's entire testimony and for a mistrial.

At a subsequent hearing outside the jury's presence (see Evid. Code, § 402), DeLoach unequivocally retracted his cross-examination statement, claiming it was based on faulty memory. He explained that he did reveal his prior activities to the *district attorney* some time *after* he spoke to defendant and the detectives, but he never told the detectives he had previously worked as an informant. DeLoach said his voir dire testimony, unlike his cross-examination testimony, had been refreshed with pertinent portions of the transcripts from the first trial. The trial court concluded, as it was empowered to do, that DeLoach's voir dire testimony was credible. The court denied defendant's motions to strike and for a mistrial.

Absent a controlling change in the facts, the court properly determined that our prior holding that DeLoach was not a "police agent" governs defendant's case on retrial. Nor have court decisions since *Whitt I, supra,* 36 Cal.3d 724, significantly changed the pertinent legal principles, such that the law of the case should be disregarded. (See *Maine* v. *Moulton* (1985) 474 U.S. 159, 176 [88 L.Ed.2d 481, 496, 106 S.Ct. 477] [Sixth Amendment violation depends upon government's "knowing exploitation" of an opportunity to coax information from a formally charged suspect in the absence of counsel]; see also *People* v. *Howard* (1988) 44 Cal.3d 375, 399-402 [243 Cal.Rptr. 842, 749 P.2d 279] [no Sixth Amendment violation under *Moulton* or *Whitt I* where "circumstances bear marked similarity to those in" *Whitt I*].) We see no error.

### E. *Defendant's Testimony*

Defendant was called to the stand as the last witness at the penalty phase. Shortly after the examination began, the prosecutor objected to two back-to-back questions on relevance grounds: "[D]o you want to live?" and "Why do you deserve to live?" The court summarily sustained both objections before any answer was given. Without attempting to reframe the questions or make an offer of proof, defense counsel Broderick declined to proceed with the examination. The prosecutor did not cross-examine defendant, and the court asked him to step down.[16]

---

[16] The examination proceeded as follows: "Q: Mr. Whitt, do you understand the proceedings that have occurred thus far? [¶] A: Yes, I think so, sir. [¶] Q: And do you understand what's at stake at this point in the proceedings? [¶] . . . A: Yes, sir. The fact whether I'm able to live or die. [¶] Q: And what do you have to say about those stakes? [¶] Mr. McDowell [the prosecutor]: Objection, your Honor. Irrelevant. [¶] The Court: Sustained. [¶] Q (By Mr.

■ Defendant first contends the court's evidentiary rulings violated his right to testify in his own behalf under the federal and state Constitutions. He relies primarily upon *People* v. *Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710], affirming the "fundamental importance" of this guaranty. However, *Robles* found a violation of the right where a defendant who demands to *"take the stand,"* even contrary to the competent advice of counsel, is prevented from doing so. (*Id.*, at p. 215, italics added; in accord, *People* v. *Lucky* (1988) 45 Cal.3d 259, 282 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v. *Harris* (1987) 191 Cal.App.3d 819, 825 [236 Cal.Rptr. 680]; cf. *Rock* v. *Arkansas* (1987) 483 U.S. 44 [97 L.Ed.2d 37, 107 S.Ct. 2704].) No such bar was erected here. Defendant was called as a witness and answered preliminary questions. The court sustained objections to a total of three questions, but did not prevent defense counsel from rephrasing them or making an offer of proof. Defendant's *Robles* claim fails.

■ Defendant insists that by sustaining prosecutorial objections, the court violated his federal constitutional right to have the sentencer consider all relevant mitigating evidence. (See *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6-7, 106 S.Ct. 1669]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954] (plur. opn. by Burger, C. J.); *People* v. *Easley* (1983) 34 Cal.3d 858, 877-878 & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) We agree. Because the range of constitutionally pertinent mitigation is so broad, the questions "Do you want to live?" and "Why do you deserve to live?" were not facially irrelevant. The court erred in sustaining the prosecutor's objections without hearing defendant's answers.[17]

The prejudicial effect of *"Skipper* error" is governed by the beyond-a-reasonable-doubt test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17

Broderick): And do you understand, however, that we're now at the stage where the jury will determine whether you live or die? [¶] A: Yes, I understand that. [¶] Q: *And do you want to live?* [¶] Mr. McDowell: Objection, your Honor. [¶] The Court: Sustained. [¶] Mr. Broderick: May I have a ground? [¶] The Court: No, you may not. I told you before that you have no right to cross-examine the Court. The ruling still stands. [¶] Mr. Broderick: I wasn't cross-examining the court . . . . [¶] . . . I was asking Mr. McDowell for a reason through the Court. [¶] The Court: Proceed, please. [¶] Q (By Mr. Broderick): *Why do you deserve to live?* [¶] Mr. McDowell: Objection, your Honor. [¶] The Court: State for the record, please. [¶] Yes. This is irrelevant information. [¶] The Court: Sustained. [¶] Mr. McDowell: And I should say for the record self-serving. [¶] The Court: Still sustained. [¶] Mr. Broderick: I have nothing further, then. [¶] The Court: Cross, please. [¶] Mr. McDowell: I have nothing to cross, your Honor. [¶] The Court: Thank you. You may step down." (Italics added.)

[17] Indeed, whatever the content of defendant's answers or his demeanor on the stand, the questions were obviously designed to assist the penalty jury in forming a meaningful picture of his character and humanity. In future cases, we strongly caution trial courts against imposing similar restrictions on a capital defendant's constitutionally protected right to give relevant penalty phase testimony.

L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065] (*Chapman*). (*People v. Lucero* (1988) 44 Cal.3d 1006, 1031-1032 [245 Cal.Rptr. 185, 750 P.2d 1342]; see *Hitchcock v. Dugger* (1987) 481 U.S. 393, 399 [95 L.Ed.2d 347, 353, 107 S.Ct. 1821]; *Rose v. Clark* (1986) 478 U.S. 570, 576-579 [92 L.Ed.2d 460, 469-471, 106 S.Ct. 3101].) On this record, however, we are precluded from reversing the penalty judgment on grounds that the error was prejudicial.

 The problem is illustrated by Evidence Code section 354, which has long prohibited state appellate courts from reversing a judgment based on the "erroneous exclusion of evidence" unless there is a "miscarriage of justice," *and* the *"substance,* purpose, *and* relevance of the excluded evidence was *made known* to the [trial] court by the questions asked, an offer of proof, or by any other means."[18] (Italics added.) The statute serves two important purposes where, as here, an appellant complains that questions he asked of his own witness at trial were wrongly disallowed on relevance grounds.

First, the "offer-of-proof" requirement gives the trial court an opportunity to change its ruling in the event the question is so vague or preliminary that the relevance is not clear. (See *People v. Redmond* (1981) 29 Cal.3d 904, 912 [176 Cal.Rptr. 780, 633 P.2d 976]; *People v. Demond* (1976) 59 Cal.App.3d 574 [130 Cal.Rptr. 590], 588; *People v. Thomas* (1970) 3 Cal.App.3d 859, 864 [83 Cal.Rptr. 879].) Second, even where the *question* is relevant on its face, the *appellate court* must know the "substance" or content of the *answer* in order to assess prejudice. (Cf. *People v. Collins* (1986) 42 Cal.3d 378, 383-385 [228 Cal.Rptr. 899, 722 P.2d 173].) This requirement is met only where the wording or context of the question makes the expected answer clear, or where the proponent of the evidence makes an offer of proof. (See *People v. McGee* (1947) 31 Cal.2d 229, 242-243 [187 P.2d 706]; *People v. Rowland* (1968) 262 Cal.App.2d 790, 798 [69 Cal.Rptr. 269].)

 In this case, though the question "Why do you deserve to live?" *might* produce a significant answer, the phraseology is so inherently broad, and the range of conceivable answers so vast, that we cannot know whether defendant's actual response might have influenced the penalty determination. (Cf. *People v. Hunter* (1989) 49 Cal.3d 957, 980-981 [264 Cal.Rptr.

---

[18] Evidence Code section 354 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error . . . is of the opinion that [it] resulted in a miscarriage of justice and . . . [¶] . . . [t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means . . . ."

367, 782 P.2d 608]; compare *People* v. *McLain* (1988) 46 Cal.3d 97, 108-109 [249 Cal.Rptr. 630, 757 P.2d 569] [expert opinion of defendant's lack of future dangerousness in prison]; *People* v. *Heishman* (1988) 45 Cal.3d 147, 193-194 [246 Cal.Rptr. 673, 753 P.2d 629] [family's description of specific traumatic events and redeeming features in defendant's life]; *People* v. *Lucero, supra,* 44 Cal.3d 1006, 1026-1032 [expert opinion of defendant's lack of future dangerousness and posttraumatic stress syndrome].)

The dissenting justices contend reversal is required under the *Chapman* standard because the state failed to sustain its "burden" of "prov[ing]" that the federal constitutional error was harmless beyond a reasonable doubt. (386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]; see also *People* v. *Lucero, supra,* 44 Cal.3d 1006, 1032.) However, the "state-burden" language in *Chapman* does not literally mean that an appellate court must reverse the judgment because the prosecution has failed to place evidence in the record showing that the error was harmless. Rather, *Chapman* is not inconsistent with the principles of state appellate review discussed above: where federal constitutional error occurs and prejudice can be assessed from the record, there is a strong presumption that the defendant was prejudiced.

The dissenters do not, of course, cite any case using this standard to reverse a criminal conviction or sentence in the unique situation presented here, i.e., where the conceivable range of answers is unlimited, and the nature of the excluded testimony is known only to the defendant and lies within his exclusive control. Because an appellate court would have no basis for concluding such error was harmless, reversal under such circumstances would be virtually automatic. Justice Mosk virtually concedes the point, while Justice Kennard attempts to circumvent it by speculating about the possible content of the excluded answers. (Cf. *Luce* v. *United States* (1984) 469 U.S. 38, 42 [83 L.Ed.2d 443, 448, 105 S.Ct. 460] [defendant must testify to preserve his appellate claim of improper impeachment under the Federal Rules of Evidence; otherwise, any error keeping him off the stand could not "logically" be deemed harmless and would result in "the windfall of automatic reversal"].) We do not read *Chapman, supra,* 386 U.S. 18, as placing an impossible "burden" upon the People, such that a defendant who withholds the nature of excluded evidence at trial is guaranteed reversal on appeal.[19]

Moreover, contrary to an assertion in Justice Mosk's concurrence and dissent, the record does not indicate that the evidentiary "void" which

---

[19] We recognize that a primary defense strategy at trial was to show that defendant had converted to Christianity on "Death Row." However, we see no basis for Justice Kennard's assertion that defendant would have embraced this theme when asked "why" he "deserve[d] to live." Defendant himself has not urged this theory on appeal. Indeed, by presenting the Christianity defense through other witnesses, trial counsel effectively immunized his client from what was likely to be searing cross-examination about the sincerity of his beliefs.

precludes our assessment of prejudice is the state's fault. (Conc. and dis. opn. by Mosk, J., *post*, at p. 666.) The record discloses only that the trial court sustained prosecutorial objections to three preliminary questions. Nothing in the court's words or manner implied that defendant was prevented from (1) continuing with the examination, (2) rephrasing the questions to elicit pertinent mitigating evidence, or (3) making an offer of proof to show that pertinent evidence was being sought from the questions already asked. Rather than pursue any of these options, defense counsel chose to sit his client down. Under these circumstances, the salutary principles of *Chapman, supra,* 386 U.S. 18, do not compel us to hold that the instant error is reversible.[20]

In his *opening brief on appeal,* defendant claims he would have told the jury about "changes" in his life and his "worth" as a human being. However, even if it were cognizable at this late stage, defendant's purported "offer of proof" is far too vague to determine whether a jury might have been influenced by his actual testimony.

Nor can we reverse on grounds that defense counsel's failure to rephrase his questions or make an offer of proof constituted ineffective assistance. Because the appellate record does not disclose what evidence was thereby omitted, it provides no basis for concluding that counsel's performance, even if deficient, caused prejudice. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 691-696 [80 L.Ed.2d 674, 695-699, 104 S.Ct. 2052].)

F. *Instructions and Argument on Method of Determining Penalty*

■■■■ Defendant claims the penalty instructions misled the jury into believing that death was "mandatory" under certain circumstances. He cites *People* v. *Brown* (1985) 40 Cal.3d 512, 544, footnote 17 [220 Cal.Rptr. 637, 709 P.2d 440], suggesting that instructions in the literal language of the 1978 death penalty statute could be misunderstood in some cases to mean that the "weighing" process: (1) is mechanical rather than normative, and (2) automatically determines the penalty regardless of jurors' views on appropriateness.[21]

---

[20] Of course, defendant was also foreclosed from answering a second possibly relevant question, "Do you want to live?" Even if we surmise that the answer would have been "yes," we find no resulting prejudice. Since most people wish to live, an affirmative answer could not have had a significant effect on the jury's assessment of mitigation.

[21] As enacted in 1978, section 190.3 provides, among other things, that the jury "shall" impose the death penalty if it finds that aggravating circumstances "outweigh" mitigating. (See also former CALJIC No. 8.84.2.) *Brown* endorsed clarifying instructions for use in future cases. *Brown* also provided that each prior trial must be examined "on its own merits" to de-

Here, however, the court gave several special instructions anticipating *Brown*'s concerns. First, in a critical departure from the statutory language, the court told the jury that it "may," not "shall," impose death if it finds that aggravating factors "outweigh" mitigating factors. The court also explained that if "the relative egregiousness or magnitude of the offense is insufficient to warrant" death, the jury is "not required" to impose that penalty but "may exercise mercy and return a verdict of life without possibility of parole."[22] These instructions left no doubt that the jury could reject death if it deemed that penalty inappropriate under the particular circumstances.

To the same end, the jury learned that it was to "consider, take into account, and be guided by" the various statutory factors, "if applicable,"[23] and that aggravating factors must be proved beyond a reasonable doubt. The jury was also told that it: (1) could be influenced by sympathy or pity, (2) was prohibited from merely counting the aggravating and mitigating factors, and (3) was required to examine the relative weight, not relative number, of factors.[24]

Moreover, counsel's arguments proceeded on the assumption that the jury was obligated to decide the morally appropriate penalty for defendant's crimes. ██ For example, the prosecutor stressed at the outset that the jury was obligated to select the "appropriate" penalty, and that it was a very "hard" decision to make.[25] He urged jurors to act as

termine whether the jury was adequately informed about the full scope of its sentencing power and responsibility. (40 Cal.3d at pp. 544, fn. 17, 545, fn. 19.)

[22] This language was contained in a modified version of former CALJIC No. 8.84.2 which provided, in pertinent part: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of death. However, if you find that the relative egregiousness or magnitude of the offense is insufficient to warrant a penalty of death, you are then not required to impose a sentence of death, but may exercise mercy and return a verdict of life without the possibility of parole[,] even though the aggravating circumstances outweigh the mitigating circumstances. [¶] If, on the other hand, you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

The court defined "egregiousness" as "outstanding for undesirable qualities."

[23] The court gave a modified version of former CALJIC No. 8.84.1 which included the "expanded factor (k)" instruction outlined in *People* v. *Easley*, *supra*, 34 Cal.3d 858, 878, footnote 10.

[24] These special instructions provided: "[I]in this phase of the trial, the law permits you to be influenced by sympathy or pity. [¶] You must not be swayed by passion, prejudice, public opinion[,] or public feelings. [¶] . . . [I]n determining whether or not the aggravating circumstances outweigh the mitigating circumstances, you must not simply count up the number of circumstances and decide whether there are more of one than of the other. Instead, you must weigh the various circumstances. The final test is in the relative weight of the circumstances, not the relative number."

[25] We see no fatal defect in the prosecutor's passing remark that "[i]n a very real sense it will not be your decision in this case as to what the penalty will be. It will be th[e] law. [The

"judges," not "voter[s]," and to carefully examine the crime from both society's and defendant's viewpoint. In a similar vein, defense counsel observed that the special instructions called for a careful "weighing" process, and permitted the exercise of mercy, sympathy, and compassion. "This is a decision," defense counsel observed, that "will probably stay with you all the rest of your life. [¶] . . . [A]s an individual, you must decide [it] for yourself . . . . We're asking [for] your own individual opinion."

Defendant argues that, assuming aggravation was found to outweigh mitigation, the special instructions were unduly mandatory because they required jurors to impose death if they found defendant's crimes to be "relatively egregious" compared to other crimes or bad acts. On the other hand, he reasons, since no standard of comparison to other capital cases was provided, the jury was left with unfettered sentencing discretion. (Citing *Gregg* v. *Georgia* (1976) 428 U.S. 153, 189 [49 L.Ed.2d 859, 883, 96 S.Ct. 2909] (plur. opn. by Stewart, J.).)

We disagree. The disputed segment of the instruction simply emphasized the normative nature of the penalty decision. Jurors were invited to employ their individual consciences in deciding "not between good and bad but between life and death." (*People* v. *Brown, supra,* 40 Cal.3d 512, 541-542, fn. 13.)

 Defendant insists the prosecutor exploited any instructional ambiguity by encouraging consideration of "extraneous" factors. He points to prosecutorial argument asking whether this "type of crime" made jurors feel "uncomfortable" or "unsafe," and whether it was "demeaning" to "human life." Viewed in context, however, these remarks directed the jury's attention to the evidence. They immediately preceded the prosecutor's description of this particular robbery-murder—that defendant shot an innocent bystander "in the middle of a parking lot in the middle of the night." The prosecutor could properly use the circumstances of the crime to imply that defendant is a dangerous person who deserves to die. (See, e.g., *People* v. *Lucky, supra,* 45 Cal.3d 259, 300.)

Defendant also notes the prosecutor identified nine factors as aggravating, none as mitigating, and two as "inapplicable." Defendant claims this numerical count, which was indeed inaccurate (see discussion, *post*), misled the jury into believing that the crimes were "relatively egregious" and warranted death. The jury, of course, should not base its penalty verdict on

law] will say that the appropriate penalty for this case is death based upon the defendant's act and . . . the type of person [he] is." A reasonable juror could only have interpreted this statement to mean that the callous nature of defendant's crimes, and the lack of compelling mitigation, made the death penalty inevitable in the hands of any jury.

the mere number of factors in each column. (See *People* v. *Brown, supra,* 40 Cal.3d 512, 541.) However, the prosecutor never asked the jury to count factors. He urged them to substantively "weigh" the evidence in each category as directed in the court's penalty instructions. Defense counsel similarly emphasized the nonmechanical nature of the jury's task. There is no reasonable possibility that the prosecutor's comments prevented jurors from weighing the aggravating and mitigating evidence to decide the appropriate penalty.

G. *Failure to Delete Assertedly "Inapplicable" Factors; Davenport Error*

■ As noted, the jury was instructed that it "shall consider" each of the statutory mitigating and aggravating factors "if applicable." (See § 190.3; former CALJIC No. 8.84.1.) Defendant contends the court had a sua sponte duty to delete assertedly "inapplicable" mitigating factors such as factors (e), (f), (g), (i), and (j).

No error occurred. Sentencing discretion is best guided where the jury is fully apprised of the factors which the state deems relevant to the penalty determination. The jury is entitled to know that defendant's crimes lack certain characteristics which might justify more lenient treatment than other offenses in the same general class. (*People* v. *Williams* (1988) 44 Cal.3d 883, 959-960 [245 Cal.Rptr. 336, 751 P.2d 395]; *People* v. *Melton, supra,* 44 Cal.3d 713, 770.) The jury itself decides which of the listed factors apply in the particular case. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].)

■ Defendant seeks to distinguish his case on grounds that the prosecutor argued that the absence of mitigating evidence in certain "inapplicable" categories was itself aggravating. However, any impropriety was harmless.

■ The prosecutor described the circumstances of the crime (factor (a)), the commission of prior violent acts (factor (b)), and defendant's 1974 robbery conviction (factor (c)) as aggravating factors.[26]

---

[26] The parties do not dispute that these three categories were properly deemed aggravating. Technically, however, the prosecutor should not have argued that the Goforth assault, which was charged and proven in *this* case, was aggravating under *both* factors (a) and (b). We have held that the phrase "criminal activity [involving] force or violence" as used in section 190.3, factor (b), *excludes* the circumstances of the crimes for which defendant is being convicted and sentenced in the capital case itself. (*People* v. *Melton, supra,* 44 Cal.3d 713, 763; *People* v.

He explained that evidence of mitigation was nonexistent under factors (d) (extreme emotional or mental disturbance), (e) (victim participation or consent), (f) (reasonable belief in moral justification), and (h) (inability to appreciate criminality). These four factors were then explicitly referred to as "aggravating." As explained further below, the prosecutor also told jurors to consider factor (i) (age) and, to a lesser extent, factor (k) (character and background) as aggravating. Finally, factors (g) (duress) and (j) (accomplice status) were said to be irrelevant.

We reject defendant's claim that factor (i) was improperly identified as aggravating in this case. The prosecutor reminded jurors that defendant had undergone several potentially maturing "life experiences," including family support, therapy, and prison. The prosecutor was free to argue that defendant, who was 30 at the time of the crimes, was deserving of harsher treatment than a more youthful offender, because he had rejected the "opportunity to be socialized, . . . to understand the reasons for the rules, . . . [and] to develop a sense of worth [towards] other human beings." (See *People* v. *Lucky, supra*, 45 Cal.3d 259, 302 [either counsel may argue any "age-related inference" which reasonably informs penalty choice].)

As agreed by the parties, factors (d), (e), (f), (h), and (k) can only mitigate. While the prosecutor could properly point to the absence of mitigating evidence in these categories, he could not argue that such deficiency was itself aggravating. (*People* v. *Ghent, supra*, 43 Cal.3d 739, 775 [1977 law]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789-790 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-289 [221 Cal.Rptr. 794, 710 P.2d 861].)[27] Nevertheless, we can only assume the jury understood how to evaluate the absence of particular mitigating factors.

*Miranda, supra,* 44 Cal.3d 57, 105-106.) However, the Goforth assault was offered at the penalty phase for the sole purpose of showing defendant's intent to kill. No reasonable juror could have been misled into "double-counting" that factor. (See *People* v. *Lucky, supra,* 45 Cal.3d 259, 301.)

Conversely, the prosecutor need *not* argue, as he did here, that the jury must elect whether to consider defendant's prior robbery conviction as aggravating under factor (b) *or* (c). Where violent "criminal activity" results in a "prior felony conviction," it shows both a propensity for violence and an inability or unwillingness to be deterred by prior criminal sanctions. The jury was entitled to consider the relevance of defendant's prior conviction for both purposes under factors (b) *and* (c). (*People* v. *Melton, supra,* 44 Cal.3d 713, 764-765.)

[27] Defendant failed to object to the prosecutor's argument. However, this case was tried before *People* v. *Davenport, supra,* 41 Cal.3d 247. We have addressed *Davenport* issues in pre-*Davenport* cases despite the failure to raise them at trial. (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1184 [259 Cal.Rptr. 701, 774 P.2d 730].) In any event, the rule that failure to object constitutes a waiver only applies if an objection or admonition would have cured the harm. (See *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) As will be discussed, the trial judge indicated in his ruling on the motion to modify the verdict that he, too, believed the absence of mitigating evidence in certain statutory categories made those factors aggravating. Thus, an objection by defense counsel would probably have been futile.

(See, e.g., *People* v. *Douglas* (1990) 50 Cal.3d 468, 537-538 [268 Cal.Rptr. 126, 788 P.2d 640]; *People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1183-1186; *People* v. *Bonin* (1988) 46 Cal.3d 659, 699-702 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People* v. *Keenan, supra,* 46 Cal.3d 478, 510-511; *People* v. *Brown* (1988) 46 Cal.3d 432, 454-456 [250 Cal.Rptr. 604, 758 P.2d 1135].)

First, as to factor (k), the jury was instructed that this category includes not only circumstances which extenuate the gravity of the crime, but also "any other aspect of the defendant's character or record that [he] offers as a basis for a sentence less than death." (See *People* v. *Easley, supra,* 34 Cal.3d 858, 878, fn. 10.) Defense counsel reviewed evidence of defendant's medical problems as a child, his drug and mental problems as an adult, and his rehabilitative potential as a prisoner. Counsel urged the jury to consider these facts as mitigating under the catchall provisions of factor (k), even if they did not "satisfy" the language of factors (d) and (h). The prosecutor essentially replied that such evidence was entitled to little mitigating weight. He noted, among other things, that defendant's childhood was "nonde-prived," that his drug and alcohol problems were self-imposed, and that the family's efforts to rehabilitate him had been rebuffed. Even though the prosecutor described factor (k) as "aggravating," any chance that the jury would consider background and character evidence as anything other than mitigating was minimal.

Moreover, the instructions and argument fully explained the jury's power and duty to determine the "appropriate" penalty by "weighing" the perti-nent sentencing factors. The jury heard the entire list of factors, and was told to consider only the "applicable" ones. In addition, defense counsel disputed the prosecutor's view of the aggravation-mitigation balance. With-out objection, counsel argued that factors (d), (h), and (k) were mitigating. Counsel also reminded jurors that they alone were to decide the weight of each factor, and that they need not unanimously agree on the existence of mitigating factors. We see no reasonable possibility that the prosecutor's argument influenced the penalty verdict.

### H. *Instruction on Governor's Commutation Power*

(21) Defendant claims the court committed reversible error under *Peo-ple* v. *Ramos, supra,* 37 Cal.3d 136 *(Ramos). Ramos* held that the so-called Briggs Instruction—describing the Governor's power to commute a sen-tence of life imprisonment—violates state due process guaranties because it "mislead[s]" the jury into believing that a death sentence cannot also be commuted, and invites consideration of irrelevant and "speculative" mat-ters. *(Id.,* at p. 153; but see *California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446] [finding no federal constitutional error].)

Two hours after the jury began penalty deliberations, it sent the trial court a note asking "what 'life without possibility of parole' means or how it is defined." Conferring with counsel in chambers, the court recalled that none of the impaneled jurors had mentioned parole or commutation during voir dire. The court said it intended to instruct the jury that life without possibility of parole "means exactly what it says, to wit, life without possibility of parole." Defense counsel concurred.

The prosecutor countered that the jury was obviously speculating about the possibility of commutation, and that the court was authorized to give a "modified" version of the Briggs Instruction. The court agreed and, over defense objection, instructed the jury that "the Governor's commutation power applies to both sentences, to wit, one[,] death or, two, life without possibility of parole. [¶] . . . [I]t would be a violation of your duty as a juror to consider the possibility of such commutation in determining the appropriate sentence."[28]

The next morning, defendant moved for a mistrial. He claimed the court misled the jurors by not informing them that commutation could be granted to defendant, an ex-felon, only "on recommendation of the Supreme Court, 4 judges concurring." (Cal. Const., art. V, § 8, subd. (a).)

Defendant's motion was denied as untimely. The court also said it would not have told the jury about the four-judge requirement in any event, because such information would only encourage further juror speculation. According to the court, the admonition against consideration of commutation cured any prejudice to defendant.

Defendant now claims the court should have instructed according to its original intent, i.e., that life without possibility of parole "means exactly what it says." He insists the court had no power to give the modified Briggs Instruction under *Ramos, supra*, 37 Cal.3d at page 159, footnote 12, because the jury did not "expressly" ask about commutation. We disagree.

*Ramos* observed that the jury may be more likely to impose death if it mistakenly believes that *only* a sentence of life without parole can be commuted to a lesser sentence which includes the possibility of parole. (37

---

[28] The prosecutor and the court relied on footnote 12 of *Ramos, supra*, 37 Cal.3d at page 159: "When the jury raises the commutation issue itself—either during voir dire or in a question posed to the court during deliberations—the matter obviously cannot be avoided and is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence."

Cal.3d at pp. 153-155 & fn. 8.) Thus, under *Ramos*, the court has authority to give the modified Briggs Instruction where it has reason to believe that the jury is speculating about such a future reduction of sentence. Here, the jury's inquiry about the "mean[ing]" and "defin[ition]" of life without possibility of parole implicitly raised the commutation question. (See *People* v. *Hunter, supra,* 49 Cal.3d 957, 981-983; *People* v. *Bonillas* (1989) 48 Cal.3d 757, 797-798 [257 Cal.Rptr. 895, 771 P.2d 844].) The court could reasonably conclude that any further inquiry about the exact nature of the jury's concern would only have focused its attention on irrelevant matters. We see no error under *Ramos, supra,* 37 Cal.3d 136.[29]

In any event, the court admonished jurors that they were not to consider the possibility of commutation in determining the appropriate sentence. Any error under *Ramos, supra,* 37 Cal.3d 136, was therefore harmless. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 782 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People* v. *Hamilton* (1988) 45 Cal.3d 351, 375 [247 Cal.Rptr. 31, 753 P.2d 1109]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 584 [244 Cal.Rptr. 121, 749 P.2d 776].)

Defendant also argues the court erred in failing to instruct, sua sponte, that his sentence could not be commuted without the approval of a majority of the Supreme Court. This instruction is obviously intended to imply that the four-judge requirement stands as a substantial obstacle to commutation of an ex-felon's sentence. As noted by the trial court, however, such information would only have focused the jury's attention on extraneous and speculative matters. Defendant also fails to demonstrate that such a "pinpoint" instruction would not itself have misled the jury by suggesting that commutation is highly unlikely in his particular case. (See generally *People* v. *Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836] [court may refuse to give confusing instruction].)

I. *Motion to Substitute Counsel*

▬ Defendant contends the court committed reversible error in failing to grant his request for substitute appointed counsel at a posttrial hearing.

---

[29] Defendant relies upon language in *People* v. *Caro* (1988) 46 Cal.3d 1035, 1064-1065 [251 Cal.Rptr. 757, 761 P.2d 680], indicating that a jury question about "parole" was not a "reference to the commutation power" and that the court was prohibited from giving the modified Briggs Instruction. However, we departed from *Caro*'s per se approach in *People* v. *Bonillas, supra,* 48 Cal.3d at pages 797-798. *Bonillas* assumed the court had *power* to give the modified instruction where the jury asked an unclear question about "parole" and "executive clemency," but that the court had no "mandatory" *duty* to do so. (*Ibid.*) *Bonillas* implicitly rejected the need for further inquiry into the precise nature of the jury's concern. Here, as in *Bonillas,* the jury's question about the "mean[ing]" of life without possibility of parole embraces executive power to commute such a sentence to include the possibility of parole. The court did not err in following *Ramos*'s suggestion that the matter "is probably best" addressed with the type of instruction given here. (37 Cal.3d at p. 159, fn. 12.)

(See *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) We disagree.

Defendant presented the court and counsel with a two-page handwritten document at a May 1985 hearing scheduled for consideration of all posttrial motions, including the automatic motion to modify the verdict. (See § 190.4, subd. (e).) Defendant's document requested "release" of current counsel and appointment of "a new attorney" who could begin familiarizing himself with the case in the event a retrial was later granted on appeal. The motion also questioned the competency of defendant's two trial counsel, Broderick and Woodson, on grounds that: (1) no defense had been presented at the special circumstance retrial, (2) Dr. Demos's testimony had not been introduced until the penalty phase, and (3) an unidentified psychologist had essentially questioned counsel's competence.

The court asked defendant whether new counsel was also being sought to review the transcripts and determine whether to expand upon a motion for new trial already pending before the court. Defendant said, "yes." The court estimated that appointment of new counsel for this purpose would delay pronouncement of judgment for over two months. The court then continued the hearing to give both sides additional time to prepare argument.

At the hearing three days later, the court asked whether the parties wished to say anything further on defendant's request for new counsel. Defendant responded with an "offer of proof" regarding statements allegedly made by the previously unidentified psychologist.[30] The court then denied the motion to substitute counsel in its entirety.

Defendant concedes he was given an adequate opportunity to present the factual basis for his request. (See *People* v. *Marsden, supra,* 2 Cal.3d 118, 123-124; cf. *People* v. *Lucky, supra,* 45 Cal.3d 259, 281.) He insists, however, that the motion should have been granted so that incompetence of trial counsel could be raised as a grounds for new trial. (Citing *People* v. *Fosselman, supra,* 33 Cal.3d 572, 582 [court may order a new trial based on ineffective assistance of counsel].)

We see no abuse of discretion. The only reasons given in support of the *Marsden* motion related to counsel's performance before or during the

---

[30] Defendant recounted a conversation he claimed to have had with Linda Meza, a defense jury consultant. Meza allegedly stated that Attorney Broderick had: (1) admitted he was not qualified to conduct a murder trial without cocounsel's help, and (2) characterized cocounsel Woodson as incompetent. According to defendant, Meza made these statements "three and a half months" before defendant moved to substitute counsel.

February 1985 special circumstance retrial. Because defendant never indicated dissatisfaction with counsel in the ensuing three- to four-month period, the court had reasonable grounds to question the sincerity of his current criticisms. In any event, the motion could properly be denied as untimely. The court was not required to stop the nearly completed proceeding in its tracks in order to allow another attorney to completely familiarize himself with the case. Denial of the *Marsden* motion was within the court's discretion. (See, e.g., *People* v. *Miranda, supra*, 44 Cal.3d 57, 77.)

### J. *Motion to Modify Penalty Verdict*

Defendant contends the trial judge "misweighed" certain statutory factors, and erroneously denied the automatic motion for modification of the death verdict. (§ 190.4, subd. (e) (hereafter section 190.4(e)).) We see no basis for a remand.

The judge began by reciting his duty to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances," and to determine whether the jury's finding that aggravation outweighs mitigation is "contrary to law or the evidence presented." (§ 190.4(e).) The judge said he had conducted an "independent" analysis under the statute. He identified six circumstances as aggravating (§ 190.3, factors (a)-(e), (g)), two as mitigating (factors (i), (k)), and three as inapplicable (factors (f), (h), (j)). The judge emphasized that defendant, a convicted robber, had "intent[ionally]" killed a bystander by "violen[t]" means in order to flee from a robbery. According to the judge, aggravation "really" outweighed mitigation, and the jury's verdict was "amply justified" by the evidence.

Defendant first claims the judge improperly found that circumstances common to most murders (e.g., intent to kill, use of a shotgun, and violence) were aggravating under factor (a) (circumstances of the crime). (Citing *People* v. *Davenport, supra*, 41 Cal.3d 247, 289 [aggravation is "a circumstance above and beyond the essential constituents of a crime"].) He urges us to find a violation of the constitutional requirement of a "meaningful" distinction between capital and noncapital murderers. (Citing *Furman* v. *Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 392, 92 S.Ct. 2726] (conc. opn. by White, J.).)

However, by limiting death eligibility to those murderers as to whom specified special circumstances have been found true, California's statute satisfies the Eighth Amendment's requirement that the category of death-eligible murderers be suitably narrowed. (See *McCleskey* v. *Kemp* (1987) 481 U.S. 279, 301-306 [95 L.Ed.2d 262, 284-288, 107 S.Ct. 1756]; *Pulley* v. *Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 42, 104 S.Ct. 871];

*Zant* v. *Stephens* (1983) 462 U.S. 862, 873-880 [77 L.Ed.2d 235, 247-252, 103 S.Ct. 2733].) Once such narrowing has occurred, the state, and the sentencer within the state's guidelines, has broad discretion to determine the appropriate penalty for the particular capital offense and offender. (See *McCleskey, supra,* at pp. 303-304 [95 L.Ed.2d at pp. 285-286]; *Zant, supra,* at pp. 878-879 [77 L.Ed.2d at pp. 250-251].) In California, such discretion includes the power to determine what "circumstances" of the capital crime "increase[] its guilt or enormity or add[] to its injurious consequences." (*People* v. *Davenport, supra,* 41 Cal.3d 247, 289.)

 Defendant claims the court "ignored" constitutionally relevant mitigating evidence unrelated to the capital offense itself. He notes that the judge viewed intoxication and family stress at the time of the crimes as "extenuating," but failed to explicitly mention other evidence of defendant's character and background.[31] However, the judge had previously instructed the jury to consider all such evidence, and announced his own obligation to do so at the start of the section 190.4(e) ruling. There is no indication the judge viewed such evidence as irrelevant. To the contrary, the judge said he had considered "sympathy" and defendant's "wishes to stay alive" as "*another* aspect" of his character offered "as a basis for a sentence less than death." (Italics added.) The motion was denied because aggravation was found to predominate. We see no error. (See, e.g., *People* v. *Ruiz* (1988) 44 Cal.3d 589, 625 [244 Cal.Rptr. 200, 749 P.2d 854].)

Defendant correctly observes that the trial judge mislabeled the absence of mitigating evidence under factors (d) (extreme emotional or mental disturbance), (e) (victim participation or consent), and (g) (duress), as aggravating. However, because such factors are rarely present in capital cases (see *People* v. *Davenport, supra,* 41 Cal.3d 247, 288-289), it is highly unlikely that their absence here significantly influenced the ruling on the modification motion. The judge placed primary aggravating weight on the callous nature of the crimes and defendant's prior conviction (factors (a)-(c)). Any mischaracterization of factors was therefore harmless under any standard. (See, e.g., *People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1186-1187; *People* v. *Brown, supra,* 46 Cal.3d 432, 462.)

As noted by defendant in his supplemental brief, the judge read the probation report before the section 190.4(e) hearing. The report was

---

[31] Under factor (k), the judge observed that defendant's "living situation was breaking up . . . [and he] was given notice of eviction by his mother [in the] presence of his father. I'm sure the defendant felt abandoned under those circumstances. [¶] . . . [H]e was indulging or overindulging in alcohol prior to the crime. These are extenuating circumstances . . . . [¶] Sympathy is now an additional factor . . . and is another aspect of the defendant's character . . . offer[ed] as a basis for a sentence less than death. Certainly the defendant wishes to stay alive. [¶] I have taken into consideration the sympathy factor . . . ."

mentioned twice during the hearing itself. First, the judge opined that defendant's statement in the report denying the murder was "not credible" in light of evidence introduced at trial. Second, defense counsel commented towards the end of the hearing that no evidence supported Goforth's statement—recounted in attachments to the same report—that her back had been injured in the assault. The judge agreed with counsel on this point.

■■■ Probation reports and victim impact statements are not presented to the jury (see §§ 1191.1, 1203, subd. (b)), and should not be read and considered by the trial judge when ruling on the automatic modification motion. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892] (*Lewis*).) The "preferable procedure" is to defer the reading of these materials until after the ruling. (*Ibid.*)

Here, however, the probation report obviously did not influence the court's decision to deny the motion. (See, e.g., *People* v. *Ramirez, supra,* 50 Cal.3d 1158, 1201.) ■■■ As noted, the trial judge relied exclusively upon the intentional, callous nature of the robbery-murder and defendant's prior robbery conviction. The judge made it clear that his "independent" review of the evidence revealed that aggravation "really" outweighed mitigation. Moreover, unlike the probation reports in either *Lewis* (judgment vacated) or *Ramirez* (judgment not vacated), the instant materials contained little evidence not introduced at trial.[32] Under the circumstances, we find no "reasonable possibility that the court's improper consideration of the probation report affected its section 190.4(e) ruling. [Citation.]" (*Ramirez, supra,* 50 Cal.3d 1158, 1202.)

K. *Constitutionality of the 1978 Death Penalty Statute*

Defendant contends the 1978 death penalty statute is unconstitutional insofar as it lacks the following requirements: (1) proof beyond a reasonable doubt of the existence of aggravating factors; (2) jury unanimity as to any aggravating factors found to support a death sentence; and (3) a jury finding beyond a reasonable doubt that aggravation outweighs mitigation and that death is the appropriate penalty. As conceded by defendant, we have consistently rejected similar attacks on both the 1977 and 1978 laws. (*People* v. *Caro, supra,* 46 Cal.3d 1035, 1068 [1978 law]; *People* v. *Howard* (1988) 44 Cal.3d 375, 443-444 [243 Cal.Rptr. 842, 749 P.2d 279] [same]; *People* v.

---

[32] A forgery arrest and three alcohol-related convictions mentioned in defendant's probation report are minor brushes with the law which cannot be deemed prejudicial in light of the prior robbery conviction properly before the court. "Victim statements" contained in attachments to the report were brief and noninflammatory. McCafferty's parents predictably urged the court to impose the strictest punishment permissible under the law, while Goforth suggested that life imprisonment was sufficient.

*Rodriguez, supra,* 42 Cal.3d 730, 777-779 [same]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 315-317 [plur. opn.], 318-319 [conc. opn. of Newman, J.] [168 Cal.Rptr. 603, 618 P.2d 149] [1977 law]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 176-180 [158 Cal.Rptr. 281, 599 P.2d 587] [plur. opn.] [same].) We see no reason to reconsider these decisions.

## IV. DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., and Arabian, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt and death eligibility. After review, I have found no reversible error bearing on those issues.

As to penalty, however, I dissent: the judgment of death should be reversed for prejudicial *Skipper* error. (*Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669].)

This court has recently become notorious for its wholehearted vindication of the "right" of capital defendants to ask for death. (See *People* v. *Clark* (1990) 50 Cal.3d 583, 617-618 [268 Cal.Rptr. 399, 789 P.2d 127]; *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1218-1228, especially 1222 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Guzman* (1988) 45 Cal.3d 915, 961-963 [248 Cal.Rptr. 467, 755 P.2d 917].) Consistency would seem to have required the majority to vindicate, at least as wholeheartedly, the right of such defendants to ask for life. Alas, the majority permit a double standard.

At the penalty phase, the court summarily sustained prosecution objections to three questions posed to defendant by counsel: "And what do you have to say about [the] stakes [at the penalty phase]?"; "And do you want to live?"; and, "Why do you deserve to live?" In so doing, it erroneously barred evidence that was highly, and indeed uniquely, relevant to the ultimate issue before the jury—whether they should condemn defendant to death or spare his life. On this record, the error cannot be deemed harmless.

"[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment, [citation], requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

"This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long.

Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304-305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (lead opn. of Stewart, Powell and Stevens, JJ.).)

To guarantee that capital sentencing decisions are as individualized and reliable as the Constitution demands, the Eighth Amendment requires that the defendant may not be barred from introducing any relevant mitigating evidence. (*Skipper* v. *South Carolina, supra,* 476 U.S. at pp. 4-8 [90 L.Ed.2d at pp. 6-9]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 112-116 [71 L.Ed.2d 1, 9-12, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 597-605 [57 L.Ed.2d 973, 985-990, 98 S.Ct. 2954] (plur. opn. by Burger, C. J.).)

Such evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense *that the defendant proffers as a basis for a sentence less than death.*" (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 990] (plur. opn. by Burger, C. J.), italics added; see *Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 110 [71 L.Ed.2d at p. 8]; *Skipper* v. *South Carolina, supra,* 476 U.S. at p. 4 [90 L.Ed.2d at pp. 6-7].)

It follows that to bar a defendant from introducing relevant mitigating evidence is error of federal constitutional dimension, which is commonly referred to as "*Skipper* error." (See generally *Skipper* v. *South Carolina, supra,* 476 U.S. at pp. 4-8 [90 L.Ed.2d at pp. 6-9]; *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 394, 398-399 [95 L.Ed.2d 347, 350-353, 107 S.Ct. 1821]; *Mills* v. *Maryland* (1988) 486 U.S. 367, 374-375 [100 L.Ed.2d 384, 393-394, 108 S.Ct. 1860]; *McKoy* v. *North Carolina* (1990) 494 U.S. 433, __-__ [108 L.Ed.2d 369, 378-381] [110 S.Ct. 1227, 1231-1234].)

To conclude that *Skipper* error has in fact occurred, however, does not end the analysis. This error is not automatically reversible, but is subject to harmless-error review under the test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] (hereafter *Chapman*). (E.g., *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031-1032 [245 Cal.Rptr. 185, 750 P.2d 1342].)

Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].) The "burden of proof" as to prejudice rests on the state. "Certainly error, constitutional error . . . casts on someone other than the person prejudiced

by it a burden to show that it was harmless . . . . [T]he beneficiary of a constitutional error [is required] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid.* [17 L.Ed.2d at pp. 710-711].) When the constitutional error occurred at the penalty phase of a capital trial, the court must proceed with special caution. (See *Satterwhite* v. *Texas* (1988) 486 U.S. 249, 258 [100 L.Ed.2d 284, 295, 108 S.Ct. 1792] [stating that "the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer"].) In such a situation, the "burden of proof" must be deemed very heavy indeed.

I turn to the case at bar. At the penalty phase, the prosecution asked for death: "Mr. Whitt has not changed. He is the same person that he was back at the time that he committed the offense." The defense sought life imprisonment without possibility of parole: "This defendant is not the same person being prosecuted today who was prosecuted [at the original trial] in 1981, in spite of what [the prosecutor] says." Counsel called several witnesses to establish defendant's decline and subsequent rehabilitation. The last was defendant himself. The following ensued.

"BY MR. BRODERICK [DEFENSE COUNSEL]:

"Q Mr. Whitt, do you understand the proceedings that have occurred thus far?

"A Yes, I think so, sir.

"Q And do you understand what's at stake at this point in the proceedings?

"A Pardon me. Could you repeat that[?]

"Q Do you understand what is at stake in the proceedings?

"A Yes, sir. The fact whether I'm able to live or die.

"Q *And what do you have to say about those stakes?*

"MR. McDOWELL [PROSECUTOR]: Objection, your Honor. Irrelevant.

"THE COURT: Sustained.

"Q (By Mr. Broderick) And do you understand, however, that we're now at the stage where the jury will determine whether you live or die?

"A Yes. I understand that.

"Q *And do you want to live*?

"MR. McDOWELL: Objection, your Honor.

"THE COURT: Sustained.

"MR. BRODERICK: May I have a ground?

"THE COURT: No, you may not. I told you before that you have no right to cross-examine the Court. The ruling still stands.

"MR. BRODERICK: I wasn't cross-examining the Court. I was asking for Mr.—

"THE COURT: You were asking for a reason—

"MR. BRODERICK: No. I was asking Mr. McDowell for a reason through the Court.

"THE COURT: Proceed, please.

"Q (By Mr. Broderick) *Why do you deserve to live*?

"MR. McDOWELL: Objection, your Honor.

"THE COURT: State for the record, please.

"MR. McDOWELL: Yes. This is irrelevant information.

"THE COURT: Sustained.

"MR. McDOWELL: And I should say for the record self-serving.

"THE COURT: Still sustained.

"MR. BRODERICK: I have nothing further, then.

"THE COURT: Cross, please.

"MR. McDOWELL: I have nothing to cross, your Honor.

"THE COURT: Thank you. You may step down." (Italics added.)

It is manifest that by summarily sustaining the prosecutor's objections the court committed *Skipper* error. The majority arrive at the same conclusion. Rightly so.

Contrary to Eighth Amendment principles that were already well and clearly established at the time of trial, the court's rulings barred defendant from introducing "relevant mitigating evidence." (*Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 114 [71 L.Ed.2d at p. 11].) Indeed, they precluded defendant's own testimony concerning the "aspect[s] of" his "character or record and . . . the circumstances of the offense that" he himself wished to "proffer[] as a basis for a sentence less than death." (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 990] (plur. opn. by Burger, C. J.).) Defendant was effectively silenced as the jury was about to decide his fate.

On this record, the *Skipper* error cannot be held harmless. As explained above, under *Chapman* there rests on the People the burden to prove that the error was harmless beyond a reasonable doubt—a burden that is very heavy indeed when, as here, the error occurred at the penalty phase of a capital trial. The People simply fail to carry that burden. Because of the error, we cannot know what specific answers defendant might have given or what precise force those answers might have carried. The void in the record is indeed disturbing. But it is the People that created the void. And it is the People that must bear the responsibility. Trying this case *almost a decade* after *Lockett* v. *Ohio, supra,* 438 U.S. 586, the prosecutor must certainly have known that no evidence was *more* relevant and *less* objectionable than the very testimony he successfully sought to preclude—a capital defendant's own words in support of his plea for life. Accordingly, on these facts I am not "able to declare a belief that [the error] was harmless beyond a reasonable doubt." (*Chapman, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 711].)

The majority arrive at the opposite conclusion. Their analysis rests on an implied premise that the burden of proof as to prejudice rests on the person complaining of the error. But as the very words of *Chapman* demonstrate, that premise is radically unsound: "Certainly error, constitutional error, . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless . . . . [T]he beneficiary of a constitutional error [is required] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (386 U.S. at p. 24 [17 L.Ed.2d at p. 710].)

The majority suggest that my reading of *Chapman* is unprecedented. But it is the majority's understanding that is novel. I focus on the plain language

of the decision, which the United States Supreme Court has often approved and never repudiated.

The majority also suggest that my reading of *Chapman* would lead to virtually automatic reversals, and that such a result would be unfair to the People. I disagree.

Of course there are errors that could possibly be held harmless beyond a reasonable doubt. Let me select an example from the case at bar. As noted, the court unconstitutionally sustained the prosecutor's objection to defense counsel's question, "And do you want to live?," and thereby improperly barred defendant's testimony in response. Considered in isolation, perhaps that single error alone might be deemed nonprejudicial on the ground that the expected affirmative answer was implied and indeed emphasized throughout the defense case. But of course that error was not isolated.

In any event, reversal for an error like that here cannot reasonably be considered unfair to the People. "Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost. [Citation.] Moreover, such circumstances involve impairments of the [Eighth Amendment] right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 692 [80 L.Ed.2d 674, 696, 104 S.Ct. 2052] [speaking of Sixth Amendment right to assistance of counsel].)

The majority seek to introduce into *Chapman* a threshold "requirement" similar to that of Evidence Code section 354: the "substance, purpose, and relevance of the excluded evidence was made known . . . by the questions asked, an offer of proof, or by any other means" (*id.*, subd. (a)). They would apparently recognize an exception like that contained in the same provision: compliance is excused when "The rulings of the court made compliance . . . futile" (*id.*, subd. (b)).

I have serious doubt that such a "requirement" would be consistent with *Chapman*. The majority evidently rely on *Luce* v. *United States* (1984) 469 U.S. 38 [83 L.Ed.2d 443, 105 S.Ct. 460] to support their position. *Luce*, however, is altogether inapposite. In that case, the court considered error and prejudice *under the Federal Rules of Evidence*. Here, the issue involves error and prejudice *under the United States Constitution*. I have found only two cases that directly bear on the question whether *Luce* affects the reversibility of error of federal constitutional dimension. (*Biller* v. *Lopes* (2d Cir. 1987) 834 F.2d 41, affg. (D.Conn.) 655 F.Supp. 292; *Biller* v. *Lopes* (D.Conn. 1987) 655 F.Supp. 292, affd. (2d Cir.) 834 F.2d 41.) Both cases

are well reasoned. Both resolve the issue in the negative. (*Biller* v. *Lopes, supra,* 834 F.2d at pp. 43-44; *Biller* v. *Lopes, supra,* 655 F.Supp. at p. 301.)

Be that as it may, compliance with the majority's "requirement" would be excused. By summarily sustaining the prosecutor's objections, and by doing so in a peremptory manner, the court effectively silenced defendant and thereby "made . . . compliance futile . . . ." (Evid. Code, § 354, subd. (b).) Contrary to the majority's implication, the record demonstrates that it would have been useless for counsel to "(1) continu[e] with the examination, (2) rephras[e] the questions . . . , or (3) mak[e] an offer of proof . . . ." (Maj. opn., *ante,* at p. 650.) In substance, the court indicated that it would not receive any mitigating evidence from defendant. As the record reveals, the court barred defendant from answering counsel's final question, "Why do you deserve to live?," on the ground that the response would be "self-serving" as well as irrelevant. *But obviously, the whole of defendant's testimony at the penalty phase would be "self-serving."* It is well settled that compliance with the requirement of Evidence Code section 354 is excused when "the trial judge . . . indicates that he will not receive evidence on a certain subject . . . ." (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 2044, pp. 2002-2003, collecting cases.) As noted, the trial judge so indicated here.

But even if the majority's unusual "requirement" is held to be applicable, it must be deemed satisfied. The very thrust of the defense case "made known" the "substance, purpose, and relevance" of the unconstitutionally excluded evidence: its "substance" was that defendant was not the man he once was; its "purpose" was to show rehabilitation; and its "relevance" was to lay "a basis for a sentence less than death" (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 990] (plur. opn. by Burger, C. J.)).

The majority demand more. Speaking of a statement in defendant's opening brief, they assert: "[D]efendant claims he would have told the jury about 'changes' in his life and his 'worth' as a human being. However, . . . defendant's purported 'offer of proof' is far too vague to determine whether a jury might have been influenced by his actual testimony." (Maj. opn., *ante,* at p. 650.) What is needed, the majority seem to say, is defendant's "actual testimony." *But that is the very matter the court unconstitutionally barred.*

For the foregoing reasons, I would reverse the judgment of death.

**BROUSSARD, J.,** Concurring and Dissenting.—I join in the concurring and dissenting opinions of Justices Mosk and Kennard asserting that the judgment of death should be reversed for prejudicial *Skipper* error. (*Skipper*

v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669].) I write separately to draw attention to two additional points.

In *People* v. *Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161] (*Whitt I*) we vacated the special circumstance finding and reversed the penalty judgment in this case because of instructional error under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. Although on retrial the court instructed on intent-to-kill pursuant to *Carlos*, defendant raises several claims on appeal relating to the intent-to-kill element upon which the jury was instructed. I agree that these arguments are insubstantial and would not warrant reversal, but I do not agree with the majority that we should dispense with the law of the case in this context and refuse to apply the rule of *Carlos*. Our decision in *Whitt I* on the *Carlos* point is law of the case, and no manifest injustice is perpetrated by adhering to it now.

An appellate court's resolution of a controlling issue in an appeal is binding throughout the subsequent progress of the case through the trial and appellate courts. (*People* v. *Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211].) Sometimes this rule is too harsh in application, and we dispense with it. (*Id.*, at pp. 845-846; *DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 179-180 [18 Cal.Rptr. 369, 367 P.2d 865].) We only dispense with it, however, when it would be unjust to adhere to it. (*People* v. *Shuey, supra,* 13 Cal.3d 835, 842.) "Application of the rule is now subject to the qualifications that 'the point of law involved must have been necessary to the prior decision, that the matter must have been actually presented and determined by the court, and that application of the doctrine will not result in an unjust decision.' [Citation.]" (*Ibid.*)

In some cases, it may be unjust to adhere to the law of the case when there has been an intervening controlling change in the law. (*George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279 [265 Cal.Rptr. 162, 783 P.2d 749]; *People* v. *Shuey, supra,* 13 Cal.3d at pp. 845-846.) In *Arakelian Farms*, plaintiff claimed that an intervening change in the law permitted the Agricultural Labor Relations Board to reconsider a rule of law stated in our first decision in the matter. We responded: "[B]efore the Board is free to disregard a lawful order of this court, judicial economy demands that Arakelian demonstrate that failure to apply *Dal Porto* [the claimed intervening "change"] would be a manifest misapplication of existing legal principles and would result in substantial injustice. [Citation.]" (49 Cal.3d at p. 1291.)

I can see no substantial injustice in adhering to our decision in *Whitt I* (*supra,* 36 Cal.3d 724) that intent to kill was an element of the felony-

murder special-circumstance finding. All defendants tried under the 1977 law received the benefit of the intent-to-kill instruction. Most defendants tried in the window period between *Carlos* and *Anderson* (*People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] [overruling *Carlos, supra,* 35 Cal.3d 131]) received an intent-to-kill instruction. Since many other persons similarly situated to defendant received the benefit of *Carlos,* we cannot say it is unjust for defendant to do so, too. Absent a showing of such substantial injustice, I would adhere to the normal rule of law of the case.

My second concern centers on the jury instruction which told the jurors the history of the case, including the information that the jury in the 1981 trial found that the appropriate penalty was death, and that we had reversed the penalty because the jury had not been instructed on intent to kill. Because of defense counsel's participation in the preparation of this instruction, and because of counsel's tactic in arguing that defendant had experienced redemption on death row, I agree with the majority that any error was invited. Nonetheless, I would urge trial courts to use extreme caution when faced with a request for such an instruction. An instruction which informs a jury that a previous jury has found death to be the appropriate penalty tends to lighten the second jury's sense of responsibility for its ultimate decision at the penalty trial. Such an instruction could easily lead the jury to believe, in violation of the Eighth Amendment, "that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 239, 105 S.Ct. 2633].)

**KENNARD, J.,** Concurring and Dissenting.—I concur in the majority's affirmance of the jury's special circumstance finding, but I dissent from its affirmance of the judgment of death.

The United States Supreme Court has held that, for a death sentence to comport with the Eighth and Fourteenth Amendments of the federal Constitution, the defendant in a capital case must be permitted to present "any and all relevant mitigating evidence that is available." (*Skipper* v. *South Carolina* (1985) 476 U.S. 1, 8 [90 L.Ed.2d 1, 9, 106 S.Ct. 1669]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 117 [71 L.Ed.2d 1, 12-13, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954].) Here the trial court failed to comply with this requirement when it precluded defendant from explaining why he deserved to live. Justice Mosk points out in his concurring and dissenting opinion that unless this court can declare its belief that the error, which is of federal constitutional dimension, was harmless beyond a reasonable doubt, reversal of the penalty judgment is required. I agree. I write separately, however, to expand on the

essential flaw in the majority's refusal to consider whether the error might have affected the jury's decision to impose the death penalty, and to show that, contrary to the majority's determination, the record adequately reveals the nature of the mitigating evidence defendant was precluded from presenting.

## DISCUSSION

Under California law, error in a criminal case is considered harmless unless the defendant can show it resulted in a "miscarriage of justice." (Cal. Const., art. VI, § 13; *People* v. *Archerd* (1970) 3 Cal.3d 615, 643 [91 Cal.Rptr. 397, 477 P.2d 421].) This means the defendant must demonstrate that without the error "it is reasonably probable a result more favorable" to the defendant would have been reached. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) In *Chapman* v. *California* (1966) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], the United States Supreme Court rejected California's "miscarriage of justice" test as inappropriate for evaluating federal constitutional error. Under *Chapman*, "the beneficiary of a [federal] constitutional error" must prove beyond a reasonable doubt "that the error complained of did not contribute to the verdict obtained." (*Ibid*. [17 L.Ed.2d 705, 710-711].) Thus, when the error violates the federal Constitution, the defendant need not show prejudice; rather, the *prosecution* must establish the *absence* of prejudice.

In this case, the majority acknowledges that by precluding defendant from answering the question, "Why do you deserve to live?," the trial court denied defendant his right to have the jury consider aspects of his character from which it might have drawn favorable inferences bearing on "his probable future conduct if sentenced to life in prison." (*Skipper* v. *South Carolina, supra*, 476 U.S. 1, 4 [906 L.Ed.2d 1, 7].) (Maj. opn., *ante*, p. 647.) We apply the *Chapman* test to a finding of "*Skipper*" error. (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1032 [245 Cal.Rptr. 185, 750 P.2d 1342].) Here, because defendant did not make an offer of proof concerning the specific content of the mitigating evidence he tried to present, the majority reasons that it cannot, and thus need not, decide whether the error prejudiced defendant's penalty phase case. I disagree.

As noted earlier, under *Chapman, supra*, 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711], federal constitutional error is prejudicial and requires reversal *unless* the reviewing court can ascertain from the record that the error was harmless beyond a reasonable doubt. The prosecution has the burden of showing that the error did not contribute to the verdict. To condition an evaluation of federal constitutional error on a defendant's offer of proof, as the majority does, relieves the beneficiary of the error (the prosecution) of

the obligation to demonstrate that the error did not affect the verdict, and impermissibly shifts to the defendant the burden of proving prejudice. The majority cites no authority to support its radical departure from *Chapman*.

Neither of the two authorities on which the majority relies, *Luce* v. *United States* (1984) 469 U.S. 38 [83 L.Ed.2d 443, 105 S.Ct. 460] and Evidence Code section 354, concerns error in violation of the federal Constitution.[1] Nor do these authorities require an offer of proof when the record establishes federal constitutional error.

Even if the majority's requirement of an offer of proof as to what defendant would have testified to is a proper condition before evaluating whether the error was prejudicial, the record here adequately reveals the nature of such testimony. (See *Pacific Gas and Electric Co.* v. *G. W. Thomas Drayage Co.* (1968) 69 Cal.2d 33, 36, fn. 1 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 91 [147 P.2d 604].) The majority, therefore, could have determined prejudice in this case.

The thrust of the defense strategy at the penalty phase was defendant's religious conversion on death row. As the majority explains, this strategy was "apparent" from "counsel's direct examination of inmates Sanders and Payton," from counsel's unsuccessful efforts to introduce into evidence "the Dove Cage magazine containing a 'Death Row' interview with defendant," and from the emphasis in counsel's closing argument that defendant was " 'not the same man' a jury had sentenced to death four years earlier." (Maj. opn., *ante*, p. 641.) Under these circumstances, defense counsel's obvious purpose in asking defendant why he deserved to live was to put before the jury defendant's personal account of his religious conversion.

Because "imposition of death by public authority is so profoundly different from all other penalties," the United States Supreme Court has stressed "the need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual . . . ." (*Lockett* v. *Ohio, supra,* 438 U.S. 586, 605 [57 L.Ed.2d 973, 990].) Although in this case

---

[1] *Luce* v. *United States, supra,* 469 U.S. 38, 42-43 [83 L.Ed.2d 443, 448-449], involves asserted error "not reaching constitutional dimensions" based on the trial court's denial of a defense motion to prohibit the prosecution from using a prior conviction to impeach the defendant.

Evidence Code section 354 provides that no judgment shall be reversed based on the improper exclusion of evidence, unless the substance, purpose, and relevance of the excluded evidence was made known to the trial court. It expressly applies only to error reviewable for "a miscarriage of justice," the standard of error set forth in the California Constitution. As noted earlier, the United States Supreme Court held this test to be inappropriate in evaluating error in violation of the federal Constitution. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

the jury knew from the testimony of inmates Payton and Sanders about defendant's religious activities in prison, only defendant himself could have conveyed to the jury the depth of the change he claimed to have undergone. Singular import is accorded "an accused's right to present his own version of events in his own words." (*Rock* v. *Arkansas* (1987) 483 U.S. 44, 52 [97 L.Ed.2d 37, 47, 107 S.Ct. 2704].) When, as here, the defendant's version of the facts would have been a personal account of how Christianity had transformed his life, offered to establish mitigation at the penalty phase of a capital case, such evidence cannot be considered cumulative.

I would reverse the judgment of death.

Appellant's petition for a rehearing was denied December 20, 1990. Mosk, J., Broussard, J., and Kennard, J., were of the opinion that the petition should be granted.